**GREENBERG TRAURIG, LLP**
ATTORNEYS AT LAW
SUITE 700
2375 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016
(602) 445-8000

Lawrence J. Rosenfeld, SBN 004426
Michael C. Mason, SBN 021921
*Attorneys for Plaintiff*
Rosenfeldl@gtlaw.com
Masonm@gtlaw.com

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Compass Bank, an Alabama state banking corporation,<br><br>Plaintiff,<br><br>v.<br><br>Kenneth R. Hartley, Jr. and Kelly Hartley, husband and wife; and Erisey Wealth Management, L.L.C., an Arizona limited liability corporation.<br><br>Defendants. | No.<br><br>**COMPLAINT** |

Plaintiff Compass Bank ("Compass"), by and through its undersigned counsel, for its Complaint against Defendants Kenneth R. Hartley, Jr., Kelly Hartley, and Erisey Wealth Management, L.L.C., alleges as follows:

**Parties, Jurisdiction and Venue**

1.  Compass is an Alabama state banking corporation, licensed to do business in the State of Arizona.

2.  Upon information and belief, Kenneth R. Hartley, Jr. ("Hartley") is a married man residing in Maricopa County, Arizona with his wife, Kelly Hartley.

3.  Hartley has caused, and continues to cause, certain acts and events to occur in Arizona out of which the allegations set forth in this Complaint arise. On information and

belief, that conduct occurred during his marriage and was in furtherance of the interest of his marital community.

4. Erisey Wealth Management, L.L.C. ("Erisey") is an Arizona limited liability corporation, with its principal place of business in Maricopa County, Arizona.

5. Hartley's acts alleged herein were committed in his individual capacity and as an authorized agent of Erisey.

6. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), as the amount in controversy, inclusive of attorneys' fees, exceeds $75,000 and the Plaintiff is a citizen of a different state than each Defendant.

7. Venue is proper in this Court, as the acts alleged herein occurred, and continue to occur, in the State of Arizona.

## General Allegations

8. Compass is a financial institution that, among other activities, provides investment, wealth management, and related services to customers in, among other states, Arizona, Colorado, New Mexico, Texas, Alabama, and Florida (the "Wealth Management Services").

9. Compass' Private Client Services Division specializes in providing Wealth Management Services to customers who have assets of over $1,000,000 or annual post-tax incomes of over $250,000.

10. Compass' Private Client Services Southwest Division is based in Scottsdale, and provides Wealth Management Services to hundreds of customers in Arizona, and portions of Colorado and New Mexico.

11. Forming and maintaining customer relationships is a central feature of the Wealth Management business, especially at the income and asset levels of the customers served by Compass' Private Client Services Division.

## Defendant Hartley's Employment With Compass

12. On or about February 19, 2001, Hartley was tendered a letter, offering him employment with Compass, as a Senior Portfolio Manager ("Offer Letter"), on the terms and

conditions set forth therein. A copy of the Offer Letter is attached as **Exhibit 1**, and is incorporated herein by reference. Hartley signed and returned the Offer Letter on February 21, 2001, and began his employment with Compass shortly thereafter.

13. The Offer Letter provides that, for a period of two years after termination of his employment with Compass, Hartley shall not "solicit for or on behalf of any firm any customer of [Compass] called on, serviced by, contacted by [Hartley] in any capacity, or otherwise known to [Hartley] in any territory in which [Compass] has been or is conducting business."

14. Hartley's consent to this non-solicitation provision was a condition of his employment at Compass.

15. Hartley remained a Senior Portfolio Manager at Compass until September 2004. In this position, he was responsible for managing customer portfolios of $1,000,000 and more. As Senior Portfolio Manager, Hartley visited customers regularly, to cultivate and maintain Compass' customer relationships and goodwill, and to ensure that customers had an ongoing direct line of communication to the bank. Additionally, as a Senior Portfolio Manager, Hartley was also expected to grow Compass' business by marketing its services and developing new customer relationships.

16. In September 2004, Hartley was promoted to Private Client Services Executive. In his position as the senior executive in Compass' Private Client Services Southwest Division, Hartley retained many of the same customer service responsibilities he had as Senior Portfolio Manager, and took on additional management responsibilities. A copy of the letter, signed by Hartley, confirming this promotion, is attached as **Exhibit 2** hereto.

17. As Private Client Services Executive, Hartley managed Compass' entire Private Client Services Southwest Division, which includes the state of Arizona, and portions of Colorado and New Mexico. Hartley knew most of Compass' Private Client Services customers in this Division personally. As to those customers he did not know well

personally, he knew who they were, the value of their portfolios, and the investment goals and strategies being employed by Compass on their behalf.

18.  During his employment with Compass, both as Senior Portfolio Manager and as Private Client Services Executive, Hartley had unrestricted access to Compass' confidential and proprietary information, including, but not limited to, its customer lists and customer portfolios; pricings; commissions; technical matters; business and financial information; methodologies; business and development plans; marketing and investment strategies; services and products; and sales goals and methods.

## The Stock Option Agreements

19.  From 2001 through 2005, Compass annually awarded Hartley stock options, ranging from 1,000 to 3,200 shares of Compass stock. In total, Hartley was granted options on 9,200 shares.

20.  Hartley exercised options on 4,900 of these shares of stock during the course of his employment. The value to Hartley of the stock he thereby obtained (based on the difference between the market price of the stock at the time of exercise, and the exercise price) was $69,272.50. If Hartley continued to hold the stock after his exercise, the value today would be even greater.

21.  Each annual grant of stock options was conditioned on Hartley's assent to a separate Stock Option Agreement ("Agreement"), each of which contained some restrictive covenants. By its terms, the April 20, 2004 Agreement ("2004 Agreement") amended all earlier stock option agreements by replacing the restrictive covenants in those earlier agreements with the restrictive covenant in the 2004 Agreement, such that the restrictive covenants in the 2001-2004 Agreements are identical. The 2004 Agreement is attached hereto as **Exhibit 3,** and is incorporated herein by reference.

22.  The 2004 Agreement granted Hartley an option to purchase 2,000 shares. It contains (as do the 2001-2003 Agreements, as amended by the 2004 Agreement) a non-solicitation covenant, which provides:

> Employee will not . . . for a period of two years (and if two years is determined by a court to be overly broad, then 18 months; and if 18 months is determined by a court to be overly broad, then 12 months) after termination for any reason of his or her employment with the Company . . . : With respect to any type of product or service offered by or available from the Company, solicit, directly or indirectly, or do any such business with any customer of the Company called on, serviced by, or contacted by the Employee in any capacity, or otherwise known to the Employee by virtue of the Employee's employment with the Company, in any state in which the Employee was employed by the Company or any state in which both the customer and the Company do business. For purposes of this Section 8(b)(1), "customer" is limited to those persons or entities that are current customers of the Company at the time Employee's employment relationship with the Company ends as well as those persons or entities who were customers of the Company in the twelve months preceding the end of Employee's employment relationship with the Company. [Paragraph 8(b)(i)]

23. Additionally, the 2001-2004 Agreements contain a non-disclosure covenant, which provides:

> The Company shall provide confidential information to Employee and, Employee agrees, during the term of his or her employment and thereafter, not to use, divulge, or furnish or make accessible to any third party, company, corporation or other organization (including, but not limited to, customers, competitors, or governmental agencies), without the Company's prior written consent, any trade secrets, customers lists, information regarding customers, information regarding Compass' relationships with specific existing or prospective customers, customer goodwill associated with Compass' trade name, or other valuable confidential and proprietary information concerning the Company or its business, including without limitation, confidential methods of operation and organization, trade secrets, confidential matters related to pricing, markups, commissions and customer lists. Employee warrants and agrees that every customer whom Employee services in any way while employed at the Company is a customer of the Company and not a customer of Employee, individually. Employee agrees that such information remains confidential even if committed to Employee's memory. [Paragraph 8(c)]

24. Hartley received valuable consideration in exchange for his agreement to abide by the restrictive covenants set forth in the 2001-2004 Agreements.

25. On April 15, 2005, Compass granted Hartley options on an additional 1,500 shares of stock, pursuant to another Stock Option Agreement ("2005 Agreement"). The 2005 Agreement is attached hereto as **Exhibit 4,** and is incorporated herein by reference.

26. The 2005 Agreement contains a non-competition covenant, which provides:

> Employee will not . . . for a period of two years (and if two years is determined by a court to be overly broad, then 18 months; and if 18 months is determined by a court to be overly broad, then 12 months) after termination for any reason

of his or her employment with the Company: Carry on or engage in a business that competes with the business of the Company within 50 miles (and if 50 miles is determined by a court to be overly broad, then 25 miles) of any city where Employee engaged in business (measured from Employee's primary office), Employee had responsibility (measured from Employee's office in such city or, if none, from the primary county courthouse of such city), other employees that were supervised by Employee worked (measured from their primary offices), or Employee otherwise conducted business for the Company (measured from Employee's office in such city or, if none, from the primary county courthouse of such city). For purposes of this subsection 8(b)(i), the "business of the Company" means that portion of the business of the Company that was conducted by Employee or those under his or her supervision. [Paragraph 8(b)(i)]

27. Additionally, the 2005 Agreement contains a non-solicitation covenant, which provides:

Employee will not . . . for a period of two years (and if two years is determined by a court to be overly broad, then 18 months; and if 18 months is determined by a court to be overly broad, then 12 months) after termination for any reason of his or her employment with the Company . . . : With respect to any type of product or service offered by or available from the Company, solicit, directly or indirectly, or do any such business with any customer of the Company called on, serviced by, or contacted by the Employee in any capacity, or otherwise known to the Employee by virtue of the Employee's employment with the Company, in any state in which the Employee was employed by the Company or any state in which both the customer and the Company do business. For purposes of this Section 8(b)(1), "customer" is limited to those persons or entities that are current customers of the Company at the time Employee's employment relationship with the Company ends as well as those persons or entities who were customers of the Company in the twelve months preceding the end of Employee's employment relationship with the Company. [Paragraph 8(b)(ii)]

28. Additionally, the 2005 Agreement contains a non-disclosure covenant, which provides:

The Company shall provide confidential information to Employee and, Employee agrees, during the term of his or her employment and thereafter, not to use, divulge, or furnish or make accessible to any third party, company, corporation or other organization (including, but not limited to, customers, competitors, or governmental agencies), without the Company's prior written consent, any trade secrets, customers lists, information regarding customers, information regarding Compass' relationships with specific existing or prospective customers, customer goodwill associated with Compass' trade name, or other valuable confidential and proprietary information concerning the Company or its business, including without limitation, confidential methods of operation and organization, trade secrets, confidential matters related to pricing, markups, commissions and customer lists. Employee warrants and agrees that every customer whom Employee services in any way while employed at the Company is a customer of the Company and not a customer of Employee, individually. Employee agrees that such information

remains confidential even if committed to Employee's memory. [Paragraph 8(c)]

29. Hartley received valuable consideration in exchange for his agreement to abide by the restrictive covenants set forth in the 2005 Agreement.

30. All of the Stock Option Agreements (2001-2005) contain a loyalty covenant, which provides, in pertinent part, that: "[w]hile Employee is employed by the Company, Employee will devote his or her entire time, energy, and skills to the service of the Company." [Paragraph 8(a)]

31. Hartley acknowledged, in all of the 2001-2005 Agreements [Paragraph 8(d)], that his breach of any of these covenants "will cause the Company substantial and irrevocable damage and, therefore, the Company shall have the right…to seek specific performance and injunctive relief, without the need for a bond or other security." [*See* 2004 and 2005 Agreements, ¶ 8(d).]

### Hartley's Activities While Employed

32. On October 11, 2005, while still employed by Compass, Hartley reserved the Erisey Wealth Management L.L.C. name with the Arizona Corporation Commission. A copy of the Name Reservation is attached as **Exhibit 5.**

33. On October 15, 2005, while still employed by Compass, Hartley executed the Articles of Organization for Erisey Wealth Management, L.L.C.. A copy of the Articles of Organization, filed with the Arizona Secretary of State on October 20, 2005, is attached as **Exhibit 6.**

34. On or about November 22, 2005, while still employed by Compass, Hartley, on behalf of Erisey, applied for an investment advisor license in the State of Michigan.

35. At or about the same time that Hartley was engaging in these activities, and just weeks before his precipitous resignation, he paid personal visits to a number of Compass' Wealth Management customers, including customers outside the State of Arizona. Compass reimbursed Hartley for the expenses he claims he incurred on this trip.

36. On November 29, 2005, Hartley resigned his employment with Compass, effective November 30, 2005.

37. While still employed by Compass, Hartley sent a direct mail announcement to a number of Compass' Wealth Management customers, informing them that, "effective immediately," he had commenced operation of a wealth management company known as Erisey Wealth Management, L.L.C. A copy of this announcement is attached hereto as **Exhibit 7**. This announcement arrived at the homes and/or offices of Compass' customers on Hartley's last day of employment with Compass.

## The Defendants' Activities Since November 30, 2005

38. Upon information and belief, Hartley is the sole member of Erisey, and is thus solely responsible for Erisey's business activities.

39. Upon information and belief, Erisey is a wealth management services company that offers services that are substantially similar to, if not precisely the same as, the services offered by Compass' Wealth Management business.

40. Since Hartley's resignation, Compass has learned that Defendants have begun providing Wealth Management Services to at least 25 Compass Wealth Management accounts, whose investment portfolios, in the aggregate, exceed $18,000,000, and which have thus far resulted in the loss of fees to Compass in an amount exceeding $130,000. Despite demand that they cease their unlawful activities, Defendants continue to solicit and/or accept Wealth Management business from Compass' customers.

41. Upon information and belief, Hartley has disclosed Compass' confidential information to Erisey, and Defendants have used Compass' confidential information to their benefit, with respect to their unlawful activities.

**COUNT I**
**Breach of Contract -**
**Offer Letter**
**(Hartley)**

42. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

43. Hartley has solicited Wealth Management business from and, as a result of those solicitations, has provided Wealth Management Services to, at least 15 Compass Wealth Management customers, in breach of his contractual obligation not to solicit the Wealth Management business of those customers, pursuant to the Offer Letter.

44. Hartley's breach of this contract has caused damage to Compass, including, but not limited to, the loss of business, revenue, and goodwill associated with these customers.

45. Hartley's conduct has caused irreparable harm to Compass. If not enjoined, Hartley's conduct will continue to cause irreparable harm to Compass, for which monetary relief alone is not sufficient.

46. As this claim arises out of contract, Compass is entitled to its reasonable attorneys' fees, pursuant to A.R.S. § 12-341.01.

### COUNT II
### Breach of Contract -
### 2001-2004 Agreements Non-Solicitation Provisions
### (Hartley)

47. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

48. Hartley has solicited Wealth Management business from, and has provided Wealth Management Services to, at least 25 Compass Wealth Management customers, in violation of his contractual obligations not to solicit or accept the Wealth Management business of those customers, pursuant to Paragraph 8(b)(i) of the 2001-2004 Agreements.

49. Hartley's breaches of these contracts have caused damage to Compass, including, but not limited to, the loss of business, revenue, and goodwill associated with these customers.

50. Hartley's conduct has caused irreparable harm to Compass. If not enjoined, Hartley's conduct will continue to cause irreparable harm to Compass, for which monetary relief alone is not sufficient.

51. As this claim arises out of contract, Compass is entitled to its reasonable attorneys' fees, pursuant to A.R.S. § 12-341.01.

## COUNT III
### Breach of Contract -
### 2001-2004 Agreements Non-Disclosure Provisions
### (Hartley)

52. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

53. Upon information and belief, Hartley has used and disclosed, and continues to use and disclose, Compass' confidential information, including, but not limited to, customer lists and portfolio information, marketing and investment strategies, business plans, commission pricing, and products and services, in conjunction with his unlawful activities at Erisey.

54. The use and disclosure of this confidential information constitutes a breach of Paragraph 8(c) of the 2001-2004 Agreements.

55. Hartley's breaches of these contracts have caused, and continue to cause, damage to Compass.

56. Hartley's conduct has caused irreparable harm to Compass. If not enjoined, Hartley's conduct will continue to cause irreparable harm to Compass, for which monetary relief alone is not sufficient.

57. As this claim arises out of contract, Compass is entitled to its reasonable attorneys' fees, pursuant to A.R.S. § 12-341.01.

## COUNT IV
### Breach of Contract -
### 2005 Agreement Non-Solicitation Provision
### (Hartley)

58. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

59. Hartley has solicited Wealth Management business from, and has provided Wealth Management Services to, at least 15 Compass Wealth Management customers, in breach of Hartley's contractual obligation not to solicit or accept the Wealth Management business of those customers, pursuant to Paragraph 8(b)(ii) of the 2005 Agreement.

60. Hartley's breach of this contract has caused damage to Compass, including, but not limited to, the loss of business, revenue, and goodwill associated with these customers.

61. Hartley's conduct has caused irreparable harm to Compass. If not enjoined, Hartley's conduct will continue to cause irreparable harm to Compass, for which monetary relief alone is not sufficient.

62. As this claim arises out of contract, Compass is entitled to its reasonable attorneys' fees, pursuant to A.R.S. § 12-341.01.

## COUNT V
### Breach of Contract -
### 2005 Agreement Non-Disclosure Provision
### (Hartley)

63. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

64. Upon information and belief, Hartley has used and disclosed, and continues to use and disclose, Compass' confidential information, including, but not limited to, customer lists and portfolio information, marketing and investment strategies, business plans, commission pricing, and products and services, in conjunction with his unlawful activities at Erisey.

65. The use and disclosure of this confidential information constitutes a breach of Paragraph 8(c) of the 2005 Agreement.

66. Hartley's breach of this contract has caused, and continues to cause, damage to Compass.

67. Hartley's conduct has caused irreparable harm to Compass. If not enjoined, Hartley's conduct will continue to cause irreparable harm to Compass, for which monetary relief alone is not sufficient.

68. As this claim arises out of contract, Compass is entitled to its reasonable attorneys' fees, pursuant to A.R.S. § 12-341.01.

**COUNT VI**
**Breach of Contract -**
**2005 Agreement Non-Competition Provision**
**(Hartley)**

69. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

70. Hartley has engaged in, and continues to engage in, the provision of Wealth Management Services, in violation of Paragraph 8(b)(i) of the 2005 Agreement.

71. Hartley's breach of this contract has caused damage to Compass, including, but not limited to, the loss of business, revenue, and goodwill, as to which monetary relief alone is insufficient.

72. Hartley's conduct has caused irreparable harm to Compass. If not enjoined, Hartley's conduct will continue to cause irreparable harm to Compass, for which monetary relief alone is not sufficient.

73. As this claim arises out of contract, Compass is entitled to its reasonable attorneys' fees, pursuant to A.R.S. § 12-341.01.

**COUNT VII**
**Breach of Contract -**
**2001-2004 Agreements Loyalty Provisions**
**(Hartley)**

74. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

75. Upon information and belief, Hartley did not devote his entire time, energy, and skills to the service of Compass during his employment. Rather, during at least the seven weeks preceding his resignation, Hartley directed his energy and skills toward establishing a company that would directly compete with Compass.

76. These disloyal and dishonest activities constitute a breach of Paragraph 8(a) of the 2001-2004 Agreements.

77. Hartley's breaches of these contracts have caused damage to Compass.

78. As this claim arises out of contract, Compass is entitled to its reasonable attorneys' fees, pursuant to A.R.S. § 12-341.01.

### COUNT VIII
### Breach of Contract -
### 2005 Agreement Loyalty Provision
### (Hartley)

79. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

80. Upon information and belief, Hartley did not devote his entire time, energy, and skills to the service of Compass during his employment. Rather, for at least the seven weeks preceding his resignation, Hartley directed his energy and skills toward establishing a company that would directly compete with Compass.

81. These disloyal and dishonest activities constitute a breach of Paragraph 8(a) of the 2005 Agreement.

82. Hartley's breach of this contract has caused damage to Compass.

83. As this claim arises out of contract, Compass is entitled to its reasonable attorneys' fees, pursuant to A.R.S. § 12-341.01.

### COUNT IX
### Implied Covenant of Good Faith and Fair Dealing
### (Hartley)

84. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

85. The Offer Letter and Stock Option Agreements include implied covenants of good faith and fair dealing.

86. Hartley's conduct, including setting up a competing business while still employed, engaging in that business after he terminated his employment, soliciting and accepting Wealth Management Services business from Compass' customers, the use and disclosure of Compass' confidential information, and, on information and belief, other actions, constitute a breach of the covenant of good faith and fair dealing implied in the

1 Offer Letter and the Stock Option Agreements, and has damaged, and continues to damage,
2 Compass.

3      87.   This breach has caused, and is continuing to cause, irreparable harm to
4 Compass.

5      88.   As this claim arises out of contract, Compass is entitled to its reasonable
6 attorneys' fees, pursuant to A.R.S. § 12-341.01.

**COUNT X**
**Violation of the Trade Secrets Act, A.R.S. § 44-401** *et. seq.*
**(Hartley and Erisey)**

10      89.   Compass realleges and incorporates by reference the allegations set forth in
11 Paragraphs 1 through 41 above.

12      90.   During the course of his employment with Compass, Hartley had access to
13 Compass' confidential and proprietary information and trade secrets, as hereinabove alleged.

14      91.   Compass at all relevant times undertook reasonable steps to safeguard its
15 confidential and proprietary information.

16      92.   Compass' confidential information, including, without limitation, its customer
17 lists and customer portfolio information, constitute "trade secrets" as that term is defined in
18 A.R.S. § 44-401, as it is information:

19           a.   from which Compass derives independent economic value, actual or
20 potential, from not being generally known to, and not being readily ascertainable by proper
21 means by, other persons who can obtain economic value from its disclosure or use; and

22           b.   that is the subject of efforts that are reasonable under the circumstances
23 to maintain its secrecy.

24      93.   Upon information and belief, Defendants have used, and continue to use,
25 Compass' confidential information, including, without limitation, its customer lists and
26 customer portfolio information, in violation of the Arizona Trade Secrets Act.

27      94.   As a direct and proximate result of Defendants' wrongful use of Compass'
28 customer lists, customer portfolio information, and other confidential and proprietary

information, Compass has suffered, and will continue to suffer, damage, including damages not entirely compensable through a monetary award.

95. Compass is entitled to injunctive relief against Defendants, and to compensation for its actual damages, pursuant to A.R.S. § 44-402.

96. Defendants have willfully and maliciously misappropriated Compass' trade secrets. They have acted, and continue to act, with an evil mind, with an intent to injure Compass, so that an award of punitive damages within the meaning of A.R.S. § 44-403 is appropriate.

97. Compass is entitled to an award of its reasonable attorneys' fees, pursuant to A.R.S. § 44-404.

### COUNT XI
### Conversion
### (Hartley and Erisey)

98. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

99. By using Compass' customer lists for improper purposes, Hartley, and, through him, Erisey, have intentionally divested Compass of its dominion and control over its customer lists and, on information and belief, other confidential and proprietary information.

100. Defendants' intentional conduct with respect to the customer lists and, on information and belief, other confidential and proprietary information, constitutes conversion, as they have treated said Compass property as their own.

101. Defendants' actions have actually and proximately caused harm to Compass. That harm is irreparable, as Defendants, by their conduct, have usurped Compass' customer relationships and goodwill for their own gain.

102. Defendants' actions are malicious and intentional, thereby entitling Compass to punitive damages in an amount necessary to deter them and others from such conduct in the future.

**COUNT XII**
**Tortious Interference with Contract**
**(Erisey)**

103. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

104. Compass has valid and enforceable contracts with Hartley, which contain restrictive covenants that apply to Hartley, as hereinabove alleged.

105. Erisey was aware of the existence of the contracts.

106. Erisey has intentionally and improperly interfered with these contracts, and each of them, by encouraging Hartley: to compete with Compass; to solicit and render Wealth Management Services to Compass' customers; and to disclose and use Compass' confidential information.

107. Erisey's interference with Compass' contracts has caused damage to Compass, including, but not limited to, loss of business, revenue, and goodwill, as to which monetary relief alone is insufficient.

108. If not enjoined, Erisey's conduct will continue to cause irreparable harm to Compass, as to which monetary relief alone is insufficient.

109. Erisey's actions in tortiously interfering with Compass' contractual relationship with Hartley are malicious and intentional, thereby entitling Compass to punitive damages, in an amount necessary to deter Erisey and others from such conduct in the future.

**COUNT XIII**
**Unjust Enrichment**
**(Hartley and Erisey)**

110. Compass realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 41 above.

111. By improperly soliciting and accepting work from Compass' customers, Defendants have diverted revenue from Compass to themselves. Such conduct has unjustly enriched Defendants, at Compass' expense, entitling Compass to restitution of all funds thus improperly diverted.

WHEREFORE, Compass prays that judgment be entered against Defendants as follows:

A.   Preliminarily and permanently enjoining Defendants and all those acting in concert with them from disclosing or using Compass' proprietary, confidential, and/or trade secret information;

B.   Preliminarily and permanently enjoining Hartley and all those acting in concert with him from soliciting or accepting Wealth Management Services from Compass' customers, for a period of 24 months;

C.   Preliminarily and permanently enjoining Hartley and all those acting in concert with him from continuing to compete against Compass by carrying on or engaging in a Wealth Management Services business within 50 miles of Hartley's former Compass office located in Scottsdale, Arizona, for a period of 24 months;

D.   Preliminarily and permanently enjoining Erisey and all those acting in concert with it from tortiously interfering with Compass' contracts with Hartley;

E.   Awarding Compass its actual damages sustained as a result of Defendants' unlawful conduct, in an amount to be proved at trial, plus prejudgment and post-judgment interest thereon at the legal rate until paid in full;

F.   Awarding Compass punitive damages;

G.   Awarding Compass its reasonable attorneys' fees and expenses accrued and accruing herein, plus interest thereon at the legal rate from the date judgment is entered until paid in full;

H.   Awarding Compass its costs accrued and accruing herein, plus interest thereon at the legal rate from the date judgment is entered until paid in full; and

I.   Awarding Compass such other and further relief as the Court deems just and proper.

1  Dated this 3 day of February, 2006.

2                                    GREENBERG TAURIG, LLP

3
                                     By:  *s/Lawrence J. Rosenfeld*
4                                         Lawrence J. Rosenfeld
                                          Michael C. Mason
5                                         Attorneys for Plaintiff